*rev*

United States District Court
Northern District of Illinois
Eastern Division

/

DEBRA L. WILLIAMS,        )
                          )
          Plaintiff,      )
                          )      No.  05 C 5239
                          )
                          )
JO ANNE BARNHART,         )      Magistrate Judge Arlander Keys
COMMISSIONER OF SOCIAL    )
SECURITY,                 )
                          )
          Defendant.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Debra L. Williams, moves this Court for Summary
Judgment pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security (the "Commissioner"), denying her
claim for Disability Insurance Benefits ("DIB"). The
Commissioner filed a Cross Motion for Summary Judgment, asking
this Court to affirm her final decision. For the reasons set
forth below, Plaintiff's Motion is granted, and the case is
remanded to the Commissioner for further proceedings consistent
with this opinion.

## Procedural History

Ms. Williams filed an application for DIB on October 7,
2002. (R. at 46.) Ms. Williams, who was 49 years old at the
time of the filing, claimed that she suffered from chronic neck,

head, and back pain. (R. at 183.) Her symptoms began in November of 1993, when she woke up in the middle of the night with severe pain in her neck. (R. at 119.) The pain later radiated to the left side of her head. (*Id.*) Ms. Williams alleged an onset of disability from October 1, 2001. (*Id.* at 46.)

The Social Security Administration ("SSA") initially denied Ms. Williams' application on February 19, 2003, and upon reconsideration on July 28, 2003. (R. at 29, 35.) On September 11, 2003, Ms. Williams requested a hearing, which was held before Administrative Law Judge ("ALJ") John L. Mondi. (R. at 39-40.) As a result of the December 16, 2004 hearing, the ALJ determined that Ms. Williams suffered a severe impairment, but that she also possessed the residual functional capacity ("RFC") to perform her past relevant work as a computer operator. (R. at 21.) Therefore, the ALJ found that Ms. Williams was not disabled within the meaning of the Social Security Act. (R. at 13.)

Ms. Williams filed a Request for Review of the ALJ's unfavorable decision on April 14, 2005. (R. at 10.) The ALJ's decision became the final agency decision when the Appeals Council denied review on August 19, 2005. (R. at 6.)

On September 13, 2005, Ms. Williams filed suit in the district court seeking review of the agency's decision and an award of benefits. The parties consented to proceed before a

2

magistrate judge and the case was reassigned to this Court on
December 22, 2005.

## **Factual Background**

### I.  **Testimony at the December 16, 2004 Hearing**

At the December 16, 2004 hearing before the ALJ, Ms.
Williams, her daughter, and her husband, testified. (R. at 174-
195). With regard to her employment history, Ms. Williams
testified that she performed work subsequent to her alleged
disability onset date of October 1, 2001. (R. at 178.) She
testified that she last worked for Casey's General Store in 2002
for approximately one year. (R. at 179.) She testified that she
worked part-time, three or four hours a day, placing frozen
donuts in an oven. (Id.) She testified that, although she was
supposed to work five days a week, she did not work when she
experienced severe pain. (Id.)

Ms. Williams testified that she was supposed to carry the
donuts back and forth but, her daughter, who also worked at the
store, set it up for her so that she would not have to lift
anything. (Id.) She explained that, when she experienced an
attack while on the job, she would call her daughter to come in
to work for her. (R. at 188.) She testified that this occurred
ten or eleven times on a monthly basis. (Id.) She testified
that her employment ended once her daughter left her job at the
store. (R. at 180.)

3

Ms. Williams testified that she applied for other jobs after leaving Casey's General Store. (Id.) She testified that her explanation of her attacks, and the likelihood that she would miss work because of her condition, precluded her from finding work. (Id.)

Ms. Williams testified that, prior to working at Casey's General Store, she worked at Safe Systems Inc., from 1994 through 2001. (R. at 180, 191.) She testified that she worked in the office until her surgery in 1996.[1] (R. at 181.) She further testified that, after her surgery, she worked from home, using a laptop provided by her employer to pull backup files. (R. at 180, 181.) Ms. Williams testified that her position required her to work a couple of hours in the morning or in the afternoon. (R. at 182.) She stated that her position ended when another company took over Safe Systems Inc. (Id.)

With respect to her health problems, Ms. Williams testified that she is in constant pain and suffers from chronic fatigue as a result. (R. at 182.) Ms. Williams testified that the pain starts in her back and her hip and travels to her neck and the side of her head. (Id.) She explained that, when she has attacks in the middle of the night, it is as if "somebody was to take a welding torch and put it on [her] skin." (R. at 183.)

[1]The record actually shows that Ms. Williams' surgery occurred in 1995, not 1996.

4

She testified that she has the attacks two or three times a night and also during the day. (R. at 183, 187)

Ms. Williams testified that she cannot take her prescription medication, Propacet, or any other prescription medication, because it causes her to vomit and have more attacks. (R. at 183.) She testified that she can only take Excedrin, which she takes ten to twenty times on an average day. (*Id.*) She explained that she also uses a heating pad and Icy Hot on her neck to alleviate her pain. (*Id.*) She testified that she has seen Dr. Michael H. Sheedy, a chiropractor, at the direction of her treating physician. (*Id.*)

With respect to her daily activities, Ms. Williams testified that her leg and hip hurt when she walks. (R. at 184.) She testified that, because she tries to shift her body to alleviate her pain, she does not sit or stand for long periods of time. (*Id.*) She also testified that she does not know if she is capable of climbing stairs; there are no stairs in her home. (*Id.*) She testified that lifting a bag of groceries causes her back to hurt. (*Id.*)

In response to questions about other sources of medical care, Ms. Williams testified that she and her treating doctor, a board-certified neurosurgeon named Dr. Gary S. Skaletsky, decided that the best route would be for her to see a chiropractor, Dr. Sheedy, which she has done and continues to do on a regular

5

basis. (*Id.*) She testified that she last saw Dr. Skaletsky in the summer of 2003 - eighteen months before her hearing. (*Id.*) She also testified that Dr. Skaletsky told her that she need not come in unless something changed drastically, because he had already done everything he could for her; her surgery in 1995 was "the last resort". (R. at 185.)

When asked about whether she is able to take care of herself in her home, Ms. Williams testified that she is able to do so on days when she feels good. (*Id.*) She testified that her daughter comes to help her when she needs something, which is typically about once a week. (*Id.*) She testified that her daughter helps her with the house and takes her to get groceries, although she can sometimes go to the grocery store herself. (*Id.*) She also testified that her husband brings things home from the store and opens cans and jars for her. (R. at 187.) She testified that she can do things around the house, like dusting, until she starts feeling pain. (*Id.*)

Regarding her hobbies and interests, Ms. Williams testified that she used to draw and crochet, but that she can no longer do so. (R. at 186.) She testified that, because of her condition, she does not visit friends or family, work in the garden, or babysit her granddaughter. (*Id.*)

Ms. Williams' daughter, Kelly Williams, testified consistently with her mother: she testified that she assisted her

6

mother while they both worked at Casey's General Store; that her mother would call and tell her that she was having one of her attacks and needed help preparing the donuts; that, two to three times a week, she would go in early and help her mother finish up. (R. at 192.)

The younger Ms. Williams testified that, although she no longer lives at home, she witnessed her mother having one of her attacks. (*Id.*) She explained that her mother would sit at the kitchen table crying, rocking herself, and begging for the pain to stop. (R. at 193.) She testified that her mother's attacks sometimes lasted an hour or more, or throughout the night. (*Id.*)

Ms. Williams' husband, Ronald Williams, also testified that his wife experienced attacks during the day, as well as at night. (*Id.*) He testified that her attacks sometimes broke after an hour or two; at other times, they could last all day and all night. (*Id.*) He also testified that her attacks sometimes occur daily. (*Id.*)

## II. **Medical History**

In addition to the hearing testimony, the ALJ considered medical records documenting Ms. Williams' physical condition, as well as progress notes and assessments from her treating physicians, her treating chiropractor, and SSA consulting physicians.

## A.  Ms. Williams' Treating Physicians and SSA Consulting Physician

The record shows that Ms. Williams first saw her treating physician, Dr. Skaletsky, on November 18, 1994. (R. at 119.) According to his notes from that first office visit, Ms. Williams had been in a normal state of good health until November of 1993. (*Id.*) She reported that, at that time, she woke up in the middle of the night with severe pain in the back and left side of her neck. (*Id.*) She reported that the pain radiated to her left occipital region and to the left side of her head and was accompanied by a burning sensation in her left ear and eye. (*Id.*) She also reported that she never had experienced such symptoms and could not recall any trauma or other precipitating events that could have caused her pain. (*Id.*)

Dr. Skaletsky noted that Ms. Williams first saw an ear, nose, and throat physician, who recommended a nasal spray with steroid medication, which she tried without success; the spray failed to alleviate her pain. (*Id.*) He noted that another physician had recommended magnetic resonance imaging and computerized tomography scans of the head and neck, which she had similarly pursued; both were normal. (R. at 114, 115.) Dr. Skaletsky also noted that Ms. Williams had undergone chiropractic treatment, with very little success. (R. at 121.)

8

At the exam on November 18, Ms. Williams complained to Dr. Skaletsky that the symptoms occurred on a daily basis, and worsened after she awoke. (*Id.*) She reported that such symptoms, while uncomfortable, did not prevent her from doing things. (*Id.*) She described the pain as feeling like her scalp "is on fire." (*Id.*) She also reported that ice to the back of her neck and the use of occipital nerve blocks provided her with some relief. (*Id.*)

As a result of the November 18, 1994 office visit, Dr. Skaletsky diagnosed Ms. Williams with left occipital neuralgia. (R. at 120.) Dr. Skaletsky recommended a course of occipital nerve blocks and possible trigger point injections with an anesthesiologist. (*Id.*) Dr. Skaletsky also noted the possibility of an occipital neurectomy if Ms. Williams' symptoms continued. (*Id.*)

The record shows that Ms. Williams saw Dr. Skaletsky again on December 15, 1994 and reported that the occipital nerve blocks provided only temporary relief. (R. at 118.) At that point, Dr. Skaletsky opined that an occipital neurectomy was an appropriate course of treatment. (*Id.*)

The record shows that, on February 17, 1995, Dr. Skaletsky performed a left occipital neurectomy on Ms. Williams. (R. at 130.) In her April 20, 1995 follow up visit, Dr. Skaletsky noted that the surgery relieved Ms. Williams' pure occipital neuralgia-

9

type pain. (R. at 132.) However, at that time, Ms. Williams complained of a sharp pain on the left side of her head that occurred only at night. (Id.) Dr. Skaletsky opined that her symptoms may represent pain radiating from the cervical spine. (Id.) As a result, he suggested that she sleep with a cervical collar. (Id.)

Ms. Williams saw Dr. Skaletsky again on May 4, 1995. (R. at 133.) At that time, Ms. Williams reported to Dr. Skaletsky that her symptoms remained unchanged since her last visit. (Id.) Ms. Williams again complained of pain in the back of her neck that traveled towards her left ear and eye. (Id.) She also reiterated that the pain only occurred at night. (Id.) This time, Dr. Skaletsky opined that her symptoms were "musculoligamentous in origin" and recommended the use of "physical therapy modalities" for relief. (Id.)

On February 15, 1996, Ms. Williams saw Dr. Michael H. Rabin, Dr. Skaletsky's partner.· (R. at 135.) Consistent with her initial follow up visit on April 20, 1995, Ms. Williams reported continued relief from her occipital nerve pain. (Id.) However, Ms. Williams still complained of pain that radiated into her face, neck, and ear. (Id.) Dr. Rabin opined that her symptoms represented an atypical trigeminal neuralgia, and he also noted

·The Court notes that the record is unclear as to whether Dr. Skaletsky or his partner, Dr. Rabin, evaluated Ms. Williams on February 15, 1996. However, because the ALJ determined that Dr. Rabin examined Ms. Williams, the Court will defer to that determination.

10

that, because she had experienced "hepatic enzyme elevations" previously, medication was "not an optimal recommendation" for pain relief. (*Id.*) Dr. Rabin concluded that her condition "may get worse with age." (*Id.*)

In a letter dated September 10, 2003, Dr. Skaletsky confirmed that Ms. Williams had been a patient of his for many years. (R. at 162.) Dr. Skaletsky diagnosed Ms. Williams with intractable head and neck pain caused by an irritability of her upper cervical roots. (*Id.*) He stated that Ms. Williams did not respond to "all means of conservative treatment"; yet, he also opined that Ms. Williams was not a surgical candidate at that time. (*Id.*)

Dr. Skaletsky further stated that Ms. Williams' symptoms prevented her from sitting with her head held in one position for any length of time, and that they also prevented her from moving her head frequently. (*Id.*) He also opined that her condition was permanent, and that, because of her persistent symptoms, she "is unable to perform any competitive employment." (*Id.*)

Ms. Williams began seeing Dr. Sheedy, a chiropractor, on April 29, 1998. (R. at 157.) In a letter dated January 8, 2003, Dr. Sheedy summarized her treatment during the period from 2001 through 2002. (R. at 161.) Consistent with her prior examinations, Ms. Williams complained of pain in the back of her head, the back of her neck, and the top of her head. (*Id.*) Dr.

Sheedy stated that the occipital neurectomy did nothing to relieve Ms. Williams' pain. (*Id.*) He further stated that the surgery resulted in a decreased range of motion and severe pain radiating into other spinal areas. (*Id.*) Dr. Sheedy opined that Ms. Williams suffered from permanent nerve damage and "will have some sort of pain, no matter what sort of work she tries to do." (*Id.*)

Dr. Sheedy also completed spinal disorders and arthritic report forms, dated July 16, 2003, at the request of the Bureau of Disability Determination Services ("DDS"). (R. at 157-160.) On the spinal disorders form, Dr. Sheedy indicated that Ms. Williams suffered from pain in the left side of her cervical spine and in the back of her neck. (R. at 157.) He noted tenderness in her neck and weakness in her entire neck area. (*Id.*) Dr. Sheedy noted that x-rays revealed compressed nerve roots. (*Id.*) He also indicated that Ms. Williams needed to change positions or posture more than once every two hours due to her pain. (R. at 158.)

On the arthritic report, Dr. Sheedy indicated that Ms. Williams suffered from "chronic subluxation" of several areas of her cervical spine. (R. at 159.) He noted tenderness in her arms and entire cervical area, as well as stiffness in her entire cervical area. (*Id.*) He noted swelling in her left arm and shoulder blade area. (*Id.*) He also indicated that Ms. Williams

reportedly suffered from fatigue and malaise, general weakness in her left hand, and difficulty in holding utensils, combing her hair, buttoning, zipping, shoulder-level reaching, and overhead reaching. (Id.) Dr. Sheedy also indicated that Ms. Williams needed to include periods of walking around during an eight-hour work day. (Id.)

In a letter dated November 10, 2004, Dr. Sheedy described Ms. Williams' history of treatment to date and listed his findings from Ms. Williams' spinal x-rays. (R. at 166.) Dr. Sheedy stated that Ms. Williams received a total of seven spinal adjustments in 1999, eleven in 2000, twelve in 2001, sixteen in 2002, seventeen in 2003, and twelve in 2004. (R. at 161, 166.) Consistent with his prior letter dated January 8, 2003, Dr. Sheedy opined that Ms. Williams suffered from permanent nerve damage, including permanent pain in the cervical spine and back. (R. at 167.) He further opined that Ms. Williams could not do any lifting, bending, or any work requiring her to sit and keep her neck bent, move her neck, or move her arms at shoulder level or higher. (Id.)

On January 22, 2003, Ms. Williams saw Dr. Roopa K. Karri, an internal medicine consultative examiner for the SSA. (R. at 142.) At that time, consistent with prior examinations, Ms. Williams complained of trigeminal neuralgia and pain in the left side of her head that radiated to the left side of her face.

13

(*Id.*) During the exam, Ms. Williams stated that she "feels like killing herself when she has such severe pain." (*Id.*)

Dr. Karri noted that Ms. Williams had used several medications in the past, including Carbamazepine and Inderal, but that they provided no relief. (*Id.*) Dr. Karri also noted that Ms. Williams had used a Transcutaneous Electrical Nerve Stimulation ("TENS") Unit, but that had only aggravated the pain. (*Id.*) Dr. Karri further noted that Ms. Williams had several tests, including temporal mandibular joint ("TMJ") testing; her TMJ test was normal. (*Id.*) Dr. Karri noted that Ms. Williams went for physical therapy and steroid shots, but those similarly failed to provide relief. (*Id.*)

Ms. Williams reported to Dr. Karri that the pain in her face occurs almost every day, and that, when it occurs, the pain makes her feel sick for the rest of the day. (R. at 142-143.) Chewing food and laughing aggravate the pain. (*Id.*) She stated that she does not like to drive because the pain can occur while driving. (*Id.*) She also stated that she was seeing a chiropractor who helped to relieve some of the pain. (*Id.*)

Dr. Karri opined that Ms. Williams had a history of trigeminal neuralgia, with severe burning pain almost every day. (R. at 144.) Dr. Karri further opined that Ms. Williams had mild hyperesthesia on the left side of her face, but had an otherwise

14

normal exam. (*Id.*) Dr. Karri indicated that Ms. Williams was not on any medication at the time of the exam. (R. at 143.)

## B. Residual Physical Function Capacity Assessment

On February 4, 2003, Dr. James Graham completed a Residual Function Capacity Assessment form on Ms. Williams at the behest of the SSA. (R. at 146-153.) Dr. Graham found that Ms. Williams was capable of lifting up to twenty pounds occasionally and ten pounds routinely, and that she could sit or stand up to six hours in an average workday. (R. at 147.) He also found that Ms. Williams could not perform repetitive reaching overhead or climb ladders, ropes, or scaffolding. (R. at 148-149.) He noted that Ms. Williams complained of chronic neck pain, but her "neurological exam was essentially normal." (R. at 153.) At the time of the evaluation, statements from Ms. Williams' treating or examining physicians were not available for Dr. Graham's review. (R. at 152.)

## C. Initial Disability Determination by SSA

Dr. Graham also completed a Disability Determination and Transmittal form for the SSA, in conjunction with DDS examiner Tim Ryan. (R. at 27.) The form indicated that Ms. Williams suffered from "discogenic and degenerative" disorders of the back. (*Id.*) Additional medical evidence, while present in the file, was insufficient to establish a secondary diagnosis. (*Id.*)

15

As a result of Dr. Graham's assessment, the SSA issued a notice denying Ms. Williams' initial disability claim. (R. at 29.)

According to the SSA's Explanation of Determination, the SSA reviewed an Arthritis and Internal Medicine Report and a report by Dr. Sheedy to evaluate Ms. Williams' claim. (R. at 32.) Based on this evidence, the SSA concluded that Ms. Williams' condition caused some restrictions in her ability to function. (*Id.*) Nevertheless, the SSA found that Ms. Williams possessed the ability to return to her work as a computer operator, based on her description of that type of work. (*Id.*)

## D.   **Reconsideration of Disability Determination by SSA**

The SSA reevaluated Ms. Williams' disability claim on July 17, 2003. (R. at 28.) Consistent with the SSA's initial disability determination, Greg Hammer, DDS disability examiner, and Dr. E.C. Bone, consulting physician, found that Ms. Williams suffered from "discogenic and degenerative" disorders of the back. (*Id.*)

In addition to reviewing the evidence listed in Ms. Williams' previous SSA denial notice, the SSA also considered another report from Dr. Sheedy. (R. at 38.) Again, the SSA concluded that, based on medical and other information, Ms.

The SSA also listed letters from Delnor Community Hospital and Kishwaukee Community Hospital. However, the letters indicated that neither hospital possessed records for the dates of service requested by the SSA. R. at 136, 139.

16

Williams' condition did not prevent her from working, and it, therefore, affirmed its prior decision. (*Id.*)

### III.  **The ALJ's February 23, 2005 Decision**

The ALJ issued his opinion on February 23, 2005, finding that Ms. Williams was not disabled and denying her claim for benefits. (R. at 16-21.) In particular, the ALJ found that Ms. Williams' history of trigeminal neuralgia, with chronic neck and other pain, although severe, did not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4. (R. at 18.)

Next, the ALJ determined that Ms. Williams possessed the RFC to perform light work, subject to some restrictions. (*Id.*) Specifically, the ALJ noted the absence of any record of subsequent visits to Dr. Skaletsky after February 15, 1996 – eight years prior to the hearing. (R. at 19.) As a result, the ALJ gave little weight to Dr. Skaletsky's September 10, 2003 letter, in which he opined that Ms. Williams was unable to perform competitive employment. (*Id.*) The ALJ stated that Dr. Skaletsky's opinion

> is not entitled to controlling weight since not well supported and indeed, inconsistent with claimant's substantial gainful activity for a year ending in late 2001 at Casey's General Store.[4]

(*Id.*)

---

[4] The record actually shows that Ms. Williams was employed by Safe Systems Inc. in 2001, not Casey's General Store. (R. at 52, 57, 71, 180-81.)

17

The ALJ further stated that Dr. Skaletsky's opinion was accorded reduced weight because it was not based on current treatment, not supported by treatment records, and not consistent with the overall record. (R. at 20.)

The ALJ also rejected the opinion of Dr. Sheedy stating

the opinion of the treating chiropractor is not an acceptable medical source [20 C.F.R. 1513(a)] and, in any case, not well supported and inconsistent with claimant's activities and use of medication.

(Id.)

Moreover, the ALJ found Ms. Williams' testimony of her pain and functional limitations incredible. In particular, the ALJ referenced

the findings on examination on January 22, 2003[9] (Exhibit 14F), her disproportionate use of analgesic medication [e.g. none on January 22, 2003 (Exhibit 14F) and only over-the-counter medication at the time of the hearing], her current pursuit of medical treatment only from a chiropractor, and her activities are not consistent with symptoms that would preclude all work.

(R. at 19). The ALJ further opined that Ms. Williams' trigeminal neuralgia did not prevent her from working, even if less than full time. (Id.) The ALJ stated that Ms. Williams' medications and treatment were not indicative of a worsening of her symptoms or a disabling condition. (Id.) Thus, the ALJ adopted Dr. Graham's assessment that Ms. Williams possessed the RFC for light

---

[9] The ALJ here makes reference to the consultative examination by Dr. Roopa K. Karri.

work, subject to restrictions against climbing ladders, ropes, or scaffolds or repetitive reaching overhead.[6]  (*Id.*)

After assessing Ms. Williams' RFC, the ALJ determined that she could return to her past work as a computer operator.  (R. at 20.)  In particular, the ALJ opined that Ms. Williams' ten year history of trigeminal neuralgia had not precluded light work in the past, and that, even if she could not perform her past relevant work, her limitations would not preclude her from performing other jobs existing in significant numbers.  (*Id.*)  Therefore, the ALJ determined that Ms. Williams was not disabled within the meaning of the Social Security Act.  (*Id.*)

## Standard of Review

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ.  *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994).  Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the courts.  *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible).  Rather, the Court must

---

[6]In his opinion, the ALJ actually refers to the "assessment of reviewing state agency physicians in May 2003" in his step three determination.  The record contains no such evidence.  Because the ALJ cites Exhibit 15F, the assessment by Dr. Graham, the Court assumes that the reference to evidence from May 2003 was in error.

19

accept findings of fact that are supported by "substantial evidence," 42 U.S.C. §405(g), that is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quoting *Richardson v. Perales*, 403 U.S. 389, 401 (1971)).

This does not mean that the Commissioner (or the ALJ) is entitled to unlimited judicial deference, however. An ALJ must sufficiently articulate his assessment of the evidence to "assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). When the ALJ fails to mention rejected evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984) *See also Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (such explanation is absolutely essential for meaningful appellate review).

Further, while the Court does not require a written evaluation of every piece of testimony and evidence submitted, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position. *Zblewski*, 732 F.2d at 78-79. And finally, the evidence supporting the agency's decision must be substantial "when viewed in the light that the

20

record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Id.* at 78.

## Social Security Regulations

The Social Security Regulations (the "Regulations") prescribe a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520 (2003). The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or medically equals any impairment listed in the Regulations as being so severe as to preclude gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); 20 C.F.R. §404.1520 (2003). A negative answer at any step other than step three precludes a finding of disability. *Young*, 957 F.2d at 389. The plaintiff has the burden of proof at steps one to four. *Young*, 957 F.2d at 389; *Balenton v. Halter*, 156 F. Supp. 2d 776, 782 (N.D. Ill. 2001). If the claimant's burden is met, the burden shifts to the Commissioner at step five to show that the claimant has the ability to engage in other work existing in significant numbers in the national economy. *Young*, 957 F.2d at 389; *Balenton*, 156 F. Supp. 2d at 782.

21

## Discussion

Applying the five-step analysis articulated above, the ALJ first determined that Ms. Williams had not engaged in substantial gainful activity since her alleged onset date. (R. at 18.) At step two, the ALJ found that, although her impairment was severe, it did not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4 (the "Listings"). (*Id.*) As a predicate to his findings at steps four and five, the ALJ determined that Ms. Williams could perform a range of light work. (*Id.*) Specifically, the ALJ found that Ms. Williams could lift up to twenty pounds occasionally and ten pounds frequently and that she could sit, stand, or walk for a total of six hours in a normal eight-hour workday. But, he found, she could not climb ladders or scaffolds, or perform repetitive reaching overhead. (*Id.*) Based on that assessment, the ALJ concluded that Ms. Williams could perform her past relevant work as a computer operator, both as generally found in the economy and as actually performed. (*Id.*) Alternatively, the ALJ found that, even if Ms. Williams could not perform her past relevant work, her limitations would not preclude her from performing other jobs existing in significant numbers. (*Id.*) As a result, the ALJ concluded that Ms. Williams was not disabled and not entitled to benefits. (*Id.*)

22

Ms. Williams argues that the ALJ's decision must be reversed or remanded for four reasons: (1) in his step three determination, the ALJ failed to adequately explain why her condition did not meet or medically equal a listed impairment; (2) the ALJ failed to adequately explain his credibility determination with respect to her pain and functional limitations; (3) in his RFC assessment, the ALJ failed to consider medical evidence and her daily activities in his analysis; and (4) the ALJ erred in his vocational determination. The Court will address each argument in turn.

## I. The ALJ's Step Three Determination

Ms. Williams first argues that the ALJ failed to adequately articulate the bases for his conclusions at step three. The Court agrees. While a written evaluation of every piece of evidence is not required, an ALJ must sufficiently articulate his assessment of evidence to assure the reviewing court that he considered important evidence and to enable the court to trace the path of the ALJ's reasoning. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Here, the ALJ provided a scant explanation of his step three determination. The ALJ's finding merely states:

[t]he claimant has a history of trigeminal neuralgia with chronic neck and other pain. Her impairment is "severe" within the meaning of the Regulations but does not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4, consistent with the assessments of reviewing state agency physicians and the medical evidence

23

at that time as well as subsequently added, as be shown below. (R. at 18.)

Notably, the ALJ made no reference to relevant Listings. In addition, while the ALJ referenced reviewing state agency physicians, he made no mention of their assessments in the rest of his decision except to adopt Dr. Graham's RFC determination. Indeed, the Court can only assume that the ALJ refers to the Disability Determination and Transmittal forms in his reference above. *See Brindisi ex rel Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (stating "failure to discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand"). Nor did the ALJ explain how the other medical evidence related to an analysis under the Listings. For example, as Ms. Williams' correctly points out, the ALJ did not discuss whether the weakness in her fingers, hands, and left arm may have met listing 11.14 for peripheral neuropathies or listing 11.08 for spinal cord or nerve root lesions. Although the ALJ discusses the findings of the SSA consulting physician, Dr. Karri, at length, he did not explain why those findings fall short of the relevant listings. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (failure to discuss the evidence in light of the relevant listing left the court with "grave reservations as to whether [the ALJ's] factual assessment addressed adequately the criteria of the listing").

On this point, both Ms. Williams and the Commissioner reference *Scheck v. Barnhart,* in which the Seventh Circuit opined that Disability Determination and Transmittal forms conclusively establish the question of equivalence by an SSA physician. *See Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). But the record in *Scheck* contained no evidence contradicting the Commissioner's position. *Id.* at 701. Here, there is at least some evidence to suggest that Ms. Williams' impairments met or equaled a listing. And the ALJ should have at least explained why he thought that wasn't the case.

The Commissioner argues that, given the record, Ms. Williams cannot, even now, satisfy all of the criteria of her proposed listings. And, in the end, that may be true. But, for now, the Court cannot determine whether the ALJ, with his perfunctory analysis, reached such a conclusion. Furthermore, it is not for the Court to make such a determination based on its review of the evidence. *See Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir. 2000) (stating "the reviewing court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility or substitute its own judgment for that of the Commissioner").

When an ALJ denies a claim for social security disability benefits, he must build an accurate and logical bridge from the evidence to his conclusion. *Lopez ex rel Lopez v. Barnhart,* 336

F.3d 535, 539 (7th Cir. 2003). The ALJ's failure to discuss or reference relevant listings, combined with his superficial analysis of the additional evidence upon which he relied, prevents any meaningful review and makes remand the appropriate course of action. See Brindisi, 315 F.3d at 786.

## II. The ALJ's Credibility Determination

Ms. Williams next argues that the ALJ's credibility determination was patently wrong. Specifically, she contends that the ALJ erred in his assessment of her chiropractic treatment and non-prescription medication. In addition, she argues that the ALJ's opinion failed to comport with SSR 96-7p. The Court agrees.

As noted by the ALJ, at her consultative examination with Dr. Karri, Ms. Williams complained of waking up with a "burning pain" on the left side of her head and face so severe that "it makes her want to kill herself." (R. at 19.) At the hearing before the ALJ, Ms. Williams testified that her attack felt like "a welding torch [being] put [on] her skin." (R. at 183.) Nevertheless, the ALJ found Ms. Williams' statements incredible, commenting:

[C]laimant's testimony, including that of pain and functional limitations, when compared against the objective evidence and evaluated using factors in SSR 96-7p, was not credible in view of, especially, the findings on examination on January 22, 2003 (Exhibit 14F) her disproportionate use of analgesic medication [e.g. none on January 22, 2003 (Exhibit 14F) and only over-the-counter medication at the time of the hearing], her current pursuit of medical

26

> treatment only from a chiropractor, and her activities are
> not consistent with symptoms that would preclude all
> work...Her use of medication and pursuit of treatment are
> also not indicative of a worsening in her symptoms or a
> disabling condition.

(R. at 19.)  In particular, the ALJ discussed that, at the
consultative examination by Dr. Karri, Ms. Williams had a full
range of motion of her shoulders, hips, neck, and back, a normal
neurological examination, and, despite a history of severe
burning pain on the left side of her face, an otherwise normal
exam.  (*Id.*)

An ALJ cannot discount a claimant's claim concerning pain
solely because it seems in excess of objective medical evidence.
*Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005).  SSR-
96-7p lists several factors that an ALJ should consider when
addressing issues of pain.  The list includes: (1) plaintiff's
activities of daily living; (2) the location, duration,
frequency, and intensity of pain or other symptoms; (3) factors
that precipitate or aggravate the symptoms; (4) what medications
plaintiff takes to alleviate pain or other symptoms, in what
dosage, and with what effectiveness and side effects; (5) what
treatment, other than medication, plaintiff undergoes or has
undergone to alleviate pain or other symptoms; (6) measures other
than treatment plaintiff uses or has used to relieve pain or
other symptoms; and (7) other factors concerning plaintiff's
functional limitations and restrictions due to pain or other

27

symptoms. Furthermore, an ALJ must articulate specific reasons for discounting a claimant's testimony as being less than credible, and may not ignore testimony or rely solely on the conflict between objective medical evidence and a claimant's testimony as a basis for a negative credibility finding. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005).

Here, the ALJ repeatedly cited Ms. Williams' pursuit of chiropractic treatment and over-the-counter medication to dismiss out-of-hand her allegations of pain. The Court is troubled by the ALJ's determination that Ms. Williams was not in pain, or was at least capable of performing light work, because she was seeking treatment solely from her treating chiropractor, Dr. Sheedy, and because she was only taking Excedrin to relieve her pain. First, as discussed above, the ALJ did not consider that Dr. Skaletsky recommended that Ms. Williams continue seeing Dr. Sheedy. Indeed, Ms. Williams testified that Dr. Skaletsky told her he was unable to do anything more for her. (R. at 185.) In other words, this was her only choice. In addition, the ALJ provided only a cursory discussion of Ms. Williams' other attempts to alleviate her pain. 20 C.F.R. 404.1529(c)(3)(v) allows an ALJ to consider "treatment, other than medication, you receive or have received for your pain or other symptoms." The ALJ did not evaluate treatments that Ms. Williams received but later discontinued due to their limited effectiveness, including

28

a course of occipital nerve blocks and trigger point injections, steroid shots, use of a TENS Unit, and physical therapy. (R. at 121, 142.) In finding incredible Ms. Williams subjective complaints of pain based, in part, on her pursuit of chiropractic treatment, the ALJ makes a negative inference based on his own independent medical findings. Ms. Williams was not sitting idly by, choosing unreasonably to live in pain; she was trying everything recommended for her, to no avail. In the end, Ms. Williams went with what worked - chiropractic treatment - even if it provided only temporary relief.

Furthermore, although SSR 96-7p allows an ALJ to consider the type, dosage, effectiveness, and side effects of a claimant's medication, the ALJ failed to take into consideration that Ms. Williams testified - and Dr. Rabin confirmed - that she had adverse reactions to her prescription medication. Indeed, Ms. Williams testified that prescription medication caused her to vomit, and Dr. Rabin opined that medication was not an optimal recommendation due to its "hepatic toxicity." (R. at 183, 135.) As Ms. Williams correctly points out, the ALJ based his credibility determination on a non-sequitur. It simply does not follow that, because Ms. Williams is only taking over-the-counter medication and seeing a chiropractor, she is not in pain severe enough to preclude her from performing light work. Again, the ALJ makes an improper inference by "playing doctor." *See Rohan*,

98 F.3d at 970 (holding that "a determination of the Commissioner must be based on testimony and medical evidence in the record; ALJs must not succumb to playing doctor and making their own independent medical judgment").

Finally, the ALJ based his credibility determination on Ms. Williams' activities, namely her ability to work during her ten-year history of trigeminal neuralgia. On this point, the ALJ stated:

Indeed, after her surgery ten years ago, her trigeminal neuralgia (Exhibit 14F) did not prevent her from working at home or for about a year at a grocery store, even if less than full time.

(R. at 19.) Here, the ALJ makes reference to Ms. Williams' employment as a computer operator with Safe Systems Inc. from 1994 to September of 2001 and as a donut maker with Casey's General Store from 2002 to May of 2003. (R. at 71, 111.) In particular, the ALJ used Ms. Williams' work history to bolster his finding that her activities were inconsistent with symptoms that would preclude all work. (R. at 19.) And yet, from his analysis, the Court cannot discern whether he considered the record as a whole.

Employment is not proof positive that a person has the ability to work, and thus is ineligible for social security disability benefits, since disabled people, if desperate, or employed by an altruist, can often hold a job. *Wilder v. Apfel,* 153 F.3d 799, 801 (7th Cir. 1998). Indeed, one can be

30

unemployable, and thus potentially eligible for social security benefits, yet employed. *Id.* Ms. Williams testified that her daughter often helped her complete her tasks during her employment at Casey's General Store. (R. at 179.) Consistent with her mother's testimony, Kelly Williams testified that she would assist her mother two or three times a week. (*Id.*) Ms. Williams further testified that her employment ended when her daughter left her position at the store to pursue another career. (R. at 180.) In addition, Ms. Williams testified that, because of her attacks, her supervisor at Safe Systems Inc. allowed her to work from home after her surgery in 1995. (R. at 182.) She also testified that her job involved pulling files, which she did for a couple hours in the afternoon or a couple of hours in the morning, depending on her employer's request. (*Id.*) The record simply does not establish an ability to hold down a job - at least not without extraordinary accommodations.

Although an ALJ's credibility determinations are generally entitled to substantial deference, an ALJ must make findings and explain them in a way that affords meaningful review. *Steele v. Barnhart*, 290 F.3d 936, 940 (2002). Given the facts and circumstances surrounding Ms. Williams' treatment, medication, and employment, the ALJ was, at a minimum, required to confront the evidence that did not support his conclusion and explain why he rejected it. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th

Cir. 2004). The Court recognizes that valid reasons may exist for the ALJ to discredit Ms. Williams' testimony regarding her pain, her pursuit of chiropractic treatment, use of non-prescription medication, and employment activities. The Court is not suggesting that the ALJ's credibility determination was inaccurate - at this point, it cannot tell - but only that greater elaboration is necessary. Indeed, it is not "merely helpful for the ALJ to articulate reasons for crediting or rejecting particular sources of evidence, it is absolutely essential for meaningful appellate review." *Zblewski*, 732 F.2d at 78-79. Because the ALJ failed to give specific reasons for his credibility findings, the Court must remand.

## III. **The ALJ's RFC Determination**

Ms. Williams next argues that the ALJ failed to consider significant evidence in making his RFC determination. Specifically, Ms. Williams contends that the ALJ erroneously (i) discounted the September 10, 2003 letter from Dr. Skaletsky; (ii) ignored her reasons for not seeking continual treatment from her treating physicians and for not taking any prescription medication; (iii) failed to consider her daily activities in his analysis; and (iv) summarily dismissed the evidence provided by her treating physician and her treating chiropractor.

32

## A. Dr. Skaletsky's September 10, 2003 Letter

Ms. Williams first argues that the ALJ erred in discounting Dr. Skaletsky's September 10, 2003 opinion, and that he failed to adequately explain why his opinion was not well supported.

Where, as here, a treating physician renders an opinion on an issue reserved for the Commissioner, an ALJ reviews all of the medical findings and other evidence that support the statement. 20 C.F.R. 404.1527(e)(1). A statement by a treating physician that a claimant is "disabled" or "unable to work" does not mean that an ALJ will render a favorable determination. *Id.*

In his letter, Dr. Skaletsky opined that Ms. Williams' symptoms prevented her from sitting with her head held in one position for any length of time or from moving it frequently. (R. at 162.) He further opined that the presence of Ms. Williams' symptoms not only constituted a permanent condition, but also made it impossible for her to perform any competitive employment. (*Id.*) The ALJ rejected the letter, finding that it lacked adequate support in the administrative record. (R. at 20.) And the Court finds no error with the rejection. The ALJ based his finding on a few key facts – first and foremost, that Ms. Williams had not visited Dr. Skaletsky since February of 1996; as the Commissioner correctly points out, as of the time of the hearing, Ms. Williams had not been under Dr. Skaletsky's care for *seven years*. As a result, Dr. Skaletsky lacked the

"longitudinal picture" that normally affords greater weight to the opinions of treating physicians. *See* 20 C.F.R. 404.1527(d)(2)(i), 404.1527(d)(3), 404.1527(d)(4); *Scheck*, 357 F.3d 702 (holding that ALJ was entitled to assign little weight to letter from claimant's back surgeon, where record contained no office notes or medical records from date of surgery onwards). Furthermore, the ALJ found that Dr. Skaletsky's assessment was not based on current treatment, not supported by treatment records, and not consistent with the overall record. (R. at 20.) And indeed, Dr. Skaletsky's records are devoid of any suggestion that Ms. Williams' possessed a "permanent condition" that made her unable to perform any employment. Dr. Skaletsky also failed to substantiate his assessment with medical evidence. *See Clifford v. Apfel*, 227 F.3d at 863 ("A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record"). Based on the foregoing, the Court is persuaded that the ALJ's decision to discount Dr. Skaletsky's September 10, 2003 opinion was well supported in the record.

## B. Ms. Williams' Reasons for Pursuing Conservative Treatment and the Use of Non-Prescription Medication

Ms. Williams next contends that the ALJ ignored the reasons she gave for not seeking continual treatment from her neurologist, Dr. Skaletsky, or for declining to take prescription medication. In support of his RFC determination, the ALJ noted

34

that (i) following her surgery in 1995, Ms. Williams' condition
was treated primarily by her chiropractor, Dr. Sheedy, since
1998; (ii) her only medication was over-the-counter Excedrin; and
(iii) she otherwise just managed her pain using a heating pad or
an ice pack. (R. at 19.) The ALJ concluded that, "given her
activities, these measures appear to be adequate to allow her to
perform at least light work." (*Id.*)

It may be true that lack of discipline, character or
fortitude, in seeking medical treatment is not a defense to a
claim for disability benefits. *Herron*, 19 F.3d at 336 (quoting
*DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989). But,
there are nonetheless valid reasons for not pursuing specific
courses of treatment. Indeed, Social Security Ruling 96-7p
provides:

> [An ALJ] must not draw any inferences about an individual's
> symptoms and their functional effects from a failure to seek
> or pursue regular medical treatment without first
> considering any explanations that the individual may
> provide, or other information in the case record, that may
> explain infrequent or irregular medical visits or failure to
> seek medical treatment...
>
> *For example: The individual may not take prescription
> medication because the side effects are less tolerable than
> the symptoms; the individual may have been advised by a
> medical source that there is no further effective treatment
> that can be prescribed and undertaken that would benefit the
> individual* (emphasis added).

Here, Ms. Williams gave these very reasons to explain her
behavior, yet the ALJ does not appear to have considered them.
And he should have.

As Ms. Williams correctly points out, at the hearing before the ALJ, she testified that she and Dr. Skaletsky decided that the most appropriate course of treatment was to continue to see Dr. Sheedy. (R. at 184.) She further testified that Dr. Skaletsky told her that she no longer needed to see him because he could do nothing more for her; her surgery – the occipital neurectomy in 1995 – was the "last resort". (R. at 185.) As a result, Ms. Williams followed the recommendation of her treating physician and saw Dr. Sheedy exclusively from 1998 through 2003. (R. at 157.) And to the extent that the ALJ thought this was unreasonable, he should have at least explained why.

Similarly, the ALJ seems to place significance on the fact that Ms. Williams took no prescription drugs, yet the ALJ recognized that Propacet, Ms. Williams' prescription medication, made her vomit. Indeed, she testified that any type of prescription medication made her vomit, and she further testified that, in addition to vomiting, her prescription medication triggered further attacks. (R. at 183.) This testimony is buttressed by Dr. Rabin's opinion that medication was "not an optimal recommendation for pain relief due to its hepatic toxicity and because of Ms. Williams' previous hepatic enzyme elevations." (R. at 135.) Again, it is hard to imagine that a claimant should be penalized for not taking medications that not only fail to provide relief, but that also make things worse by

aggravating her attacks. Yet, to the extent the ALJ thought Ms. Williams' actions unreasonable, he should at least have explained why.

## 1. The ALJ's Consideration of Ms. Williams' Daily Living Activities

Ms. Williams next argues that the ALJ failed to adequately evaluate her daily living activities. To be sure, the ALJ says little about this issue. Referencing the January 22, 2003 DDS consultative examination, the ALJ commented on Ms. Williams' reported ability to perform daily activities, drive occasionally, and go shopping, if accompanied. But he never says anything about such evidence, except to note several times that Ms. Williams' activities are inconsistent with symptoms that preclude all work. After the ALJ discussed her forms of treatment, for example, he concludes that "[g]iven her activities, these measures appear to be adequate to allow her to perform at least light work." Yet it is not clear what activities the ALJ may have considered in his analysis. Even the cited activities (occasional driving and shopping when accompanied) are fairly restricted. Moreover, a claimant's ability to perform minimal daily activities does not establish that he or she is capable of engaging in substantial physical activity. *Clifford*, 227 F.3d at 872. Here, the ALJ failed to make an adequate examination and analysis of Ms. Williams' activities and the effects of her impairment upon those activities.

**D. The ALJ's Rejection of Dr. Sheedy's Opinion**

Finally, Ms. Williams argues that the ALJ summarily dismissed the evidence provided by Dr. Sheedy, her treating chiropractor. On this point, the ALJ stated "[t]he opinion of the treating chiropractor is not an acceptable medical source [20 C.F.R. 1513(a)], and, in any case, [it is] not well supported and inconsistent with claimant's activities and use of medication." (R. at 20.)

While it is true that other circuits have held that a chiropractor is not "an acceptable medical source" and should not be afforded controlling weight under 20 C.F.R. 404.1513(a), the Seventh Circuit has yet to decide this issue. *See, e.g., Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995); *Hartranft v. Apfel*, 181 F.3d 358, 316 (3d Cir. 1999); *Cronkhite v. Sullivan*, 935 F.2d 133, 134 (8th Cir. 1991); *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 530 (6th Cir. 1997). Nevertheless, the Social Security regulations permit an ALJ to consider "other sources" of evidence, which may include chiropractors. *See Wright v. Barnhart*, No.4:04-CV-0215-DFH-WGH, 2005 WL 1799506, at *5 (S.D. Ind. July 25, 2005). And indeed, the regulations provide examples of these "other sources:"

> In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work.

> Other sources include, but are not limited to — (1) Medical
> sources not listed in paragraph (a) of this section (for
> example, nurse-practitioners, physicians' assistants,
> naturopaths, *chiropractors*, audiologists, and therapists)
> (emphasis added).

20 C.F.R. 404.1513(d)(1).

Some circuits have similarly recognized the ALJ's discretion
to afford chiropractic opinions some weight in light of the
entire administrative record. *See, e.g.,* *Cronkhite*, 935 F.2d at
134 (recognizing that chiropractors' opinions may be used to show
how a claimant's impairment affected his ability to work);
*Walters*, 127 F.3d at 530 (holding that, while a treating
chiropractor is not a medical source, an ALJ has discretion to
determine the appropriate weight to accord a chiropractor's
opinion based on all of the evidence in the record).

Given the particular facts of this case, where all of Ms.
William's recent medical evidence is from a treating
chiropractor, the ALJ should have exercised his discretion
pursuant to 20 C.F.R. 404.1513(d)(1), and afforded some - but not
necessarily controlling - weight to Dr. Sheedy's findings.
Without the chiropractic findings, Ms. Williams lacks objective
evidence upon which to base her claim; the ALJ correctly
discounted the September 10, 2003 assessment of her treating
physician, Dr. Skaletsky, and his records from eight years prior
to Ms. Williams' hearing. And, similar to Ms. Williams' use of
over-the-counter medication, her pursuit of chiropractic

treatment was not unreasonable. Again, the ALJ failed to consider that, according to Ms. Williams' testimony, Dr. Skaletsky could do nothing more for her. (R. at 185.) Simply put, she was given no other choice. It is inappropriate for an ALJ to dismiss a claimant's complaints almost solely on the basis of her pursuit of chiropractic treatment, when she was merely following her doctor's orders.

To be sure, the ALJ states in his opinion that Dr. Sheedy's opinions were not well supported. But, he never discusses the chiropractic findings against the other medical evidence he relied upon in the record. And he should have. *See Wright*, No.4:04-CV-0215-DFH-WGH, 2005 WL 1799506 at *5 (finding that an ALJ may discount a treating source's opinion if it is inconsistent with the opinion of a consulting physician as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability"). In summarily dismissing Dr. Sheedy's findings, the ALJ failed to provide the Court with enough analysis to assess the validity of his ultimate findings and afford Ms. Williams meaningful judicial review. *See Scott*, 297 F.3d at 595.

## IV. The ALJ's Vocational Profile Determination

As a tangent to the ALJ's step four findings, Ms. Williams argues that the ALJ erred in determining that her past relevant work was that of a "computer operator." As the Commissioner correctly points out, the relevant inquiry in determining whether Ms. Williams could return to her past relevant work is whether she could perform her job as generally found in the economy *or as actually performed*. *Abrogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988)(emphasis added). If, upon remand, the ALJ determines that Ms. Williams could perform her work as a computer operator as actually performed, the question of whether Ms. Williams could perform the work of a computer operator as described in the Dictionary of Occupational Titles is immaterial.

## Conclusion

For the reasons set forth above, the Court finds that the ALJ failed to adequately articulate the bases for his conclusions, which precludes any meaningful judicial review. In particular, the Court finds that the ALJ failed to adequately explain why Ms. Williams' condition did not meet or medically equal a listed impairment, and failed to give his reason for rejecting Ms. Williams' pursuit of chiropractic treatment and use of over-the-counter medication as evidence of her impairment. Accordingly, the Court finds that the case must be remanded, and, therefore grants Ms. Williams' Motion for Summary Judgment and

41

denies the Commissioner's Motion for Summary Judgment. The matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: August 7, 2006

ENTER:

_Arlander Keys_
ARLANDER KEYS
United States Magistrate Judge